1

2    Michael Campillo (019014)
     VENJURIS, P.C.
3    1938 East Osborn Rd.
     Phoenix, Arizona 85016
4    Tel: 602-631-9100
     Fax: 602-631-4529
5    Email: mcampillo@venjuris.com

6
     Attorneys for Plaintiff
7

8
                    **UNITED STATES DISTRICT COURT**
9
                  **DISTRICT OF ARIZONA-Tucson Division**
10

11

12   James Richard Hathaway, an individual;        Case No. CV-00055-TUC-DTF
13
               Plaintiff,
14                                                    (Hon. D. Thomas Ferraro)
      v.
15
                                                    **Plaintiff's Response in Opposition to**
16   Philip Caputo, an individual;                  **Defendants' Motion to Dismiss Under**
                                                    **Rule 12(b)(6)**
17   Penguin Random House, a Delaware
     Corporation; and
18
     Amazon.com, Inc., a Delaware corporation
19
     Audible, Inc. a Delaware corporation
20
               Defendants
21

22

23

24         Plaintiff James Richard Hathaway (hereinafter, "Plaintiff") Responds in

25   Opposition to the Defendants' Motion to Dismiss Plaintiff's First Amended

26   Complaint ("Motion to Dismiss") (DOC. 33), or in the alternative, requests leave to

27   amend the Plaintiff's First Amended Complaint (DOC. 13) to cure any deficiency this

28

                                        -1-

1    Court finds.[1] This Response in Opposition ("Response") is supported by the

2    Declaration of Jason Bergeron ("Bergeron Decl."), the Declaration of Plaintiff James

3    Richard Hathaway ("Hathaway Decl."), and the exhibits attached to each declaration,

4    respectively.

5         Defendants' Motion to Dismiss should be denied, or alternatively, Plaintiff

6    should be given the opportunity to amend the First Amended Complaint to cure any

7    deficiency this Court finds. Defendants have notice of the extent of Plaintiff's

8    evidence and claims. Plaintiff's evidence and claims were disclosed in its First

9    Amended Complaint and clarified in prefiling settlement communications between

10   Plaintiff's counsel and Defendant Penguin Random House. Those claims and

11   evidence are clarified further herein.  Plaintiff's Response clarifies that Defendants

12   infringed either or both of Plaintiff's rights to make copies or first publish several

13   stories in the *Don Jimito* manuscript. Accordingly, if this Court believes that the First

14   Amended Complaint is deficient under Rule 12(b)(6), Plaintiff requests leave of Court

15   to amend the First Amended Complaint to clarify its claims against the Defendants.

16

17   **I.     INTRODUCTION**

18        It is undisputable that Defendant Caputo obtained and relied on Plaintiff's

19   manuscript, *Don Jimito*. "Caputo admits in a public setting that he wanted to make a

20   story about the Arizona/Mexican border but had no plot or characters until he

21   acquired the "Don Jimito" manuscript." First Amended Complaint, ¶ 27 (DOC 013).

22   Plaintiff alleges that Defendant Caputo selected and paraphrased unpublished stories

23   from Plaintiff's manuscript (id. ¶s 13, 17, 28), and that the character of Ben Erskine in

24   *Crossers* is unmistakably, Jim Hathaway (id. ¶s 29), and that the selection of least

25   twelve original stories, with original protectable elements in each, were copied by

26

27   _____

     [1] Plaintiff will request that Defendants consent to proposed amendments to Plaintiff's

28   First Amended Complaint and file a motion requesting leave of Court to amend if
     Defendants do not grant Plaintiff's requested consent.

1   Defendant Caputo from *Don Jimito* (id. ¶ 30). Defendants' Motion to Dismiss does

2   not deny the similarities alleged but instead argues that the Defendants' copying is

3   excused by Ninth Circuit precedent. Plaintiff on the other hand contests Ninth Circuit

4   law and Supreme Court precedent still protects Plaintiff's manuscript against

5   Defendants' unlicensed copying and unauthorized first publication of stories from

6   *Don Jimito*.

7

8   **II.    LEGAL ARGUMENT**
    **A.    STANDARD**

9        A Rule 12(b)(6) challenge requires that a court presume as true the complaint's

10  factual allegations and then examine those factual allegations for plausibility. *See*

11  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 1949-50, 173 L.Ed. 2d 868

12  (2009). "Notice" pleading remains the rule in federal courts. *Lee v. City of Los*

13  *Angeles*, 250 F.3d 668, 679 (9th Cir. 2000) ("all the Rules require is a "short and plain

14  statement of the claim" that will give the defendant fair notice of what the plaintiff's

15  claim is and the grounds upon which it rests"). Moreover, so long as additional

16  materials are consistent with the pleadings, the materials can clarify allegations of the

17  pleading. *See Pegram v. Herdrech*, 530 U.S. 211, 120 S.Ct. 2143, 2155, 147 L.Ed.2d

18  164 (2000).

19

20  **III.   BACKGROUND**

21       Plaintiff's father, James Howard Hathaway (deceased) (hereinafter "Howard

22  Hathaway", or sometimes, "Hathaway"), authored *Don Jimito*, which recounts the life

23  of Plaintiff's larger-than-life grandfather, Jim Hathaway, who was born in Lochiel in

24  Santa Cruz County, Arizona in 1892, and was a renaissance man by nature and

25  necessity. No words capture the spirit of Jim Hathaway better than those expressed by

26  Howard Hathaway in the Forward to *Don Jimito*:

27

28

"Jim was one of those rare specimens, one of those unusual combinations of characteristics, which appears once in several generations in the human, lower animal and plant kingdom. Then a comparable individual won't appear for several more generations.

How does one label or describe such a man? Here is an attempt to set forth, in writing, a biography of a person so unusual that I am wondering how to begin.

It would require the collaboration of several who knew Jim well to produce a well rounded history of this enigmatic personage to each whose life touched his, for however long or briefly, a different but lasting impression resulted. His list of friends and admirers was long. So was the list of his enemies. Some of the latter hated him enough to want to kill him. Some tried and other hired assassins to eliminate him.

Whereas most average personalities can be described or summed up in two or three paragraphs, here is a man whose complex makeup defies a concise, complete analysis. It would be too simple to say he was many things to many people. He was many things to each who knew him for any length of time.

Here am I, his own son, freely confessing that I probably knew less about him and his adventures than others who weren't related to him.

So enough of theorizing and of trying to introduce this writing. Bewildered as to where and how to begin, I must select an entrance way, commence the narrative and do my feeble best."

– James H. Hathaway, Forward to *Don Jimito.*

Howard Hathaway wrote *Don Jimito* after the death of his father. The manuscript is a collection of tales passed down from Jim Hathaway, his friends, acquaintances, and relatives, that recount the life of Jim Hathaway. The extent of which each story in *Don Jimito* is 100% true is indeterminable due to the lapse in time and the death of eyewitnesses who have now likely all passed on. Most likely, the stories are based in truth but also embellished for entertainment's value. The manuscript reveals however that Howard Hathaway had a talent for storytelling, which was recognizable by others. In 1985, at the "Old Main Day" event that celebrated contributions from alumni to the University over the previous 100 years, the Dean of Students honored Howard Hathaway and his written submission as the best or most interesting memory of Old Main from several dozen entries. Bergeron Decl. ¶s 16, 17. Moreover, that *Don Jimito* is a valuable resource of stories is evidenced not only by Defendant Caputo's extensive reliance on the manuscript, but also by Ms. Betty Barr's reliance who penned several columns on Jim Hathaway in a Santa Cruz county periodical *The Bulletin* and also used the manuscript as a resource.

**IV.   COPYRIGHT AND NINTH CIRCUIT LAW PROTECTS AN AUTHOR'S ORIGINAL EXPRESSION, AND SELECTION AND ARRANGEMENT**

Copyright law serves to protect the original works authors by prohibiting copying by others. U.S. CONST. art. I, § 8, cl. 8. Registration of the work grants the copyright owner a private monopoly on the work for a limited time to print, reprint, amend, adapt, copy, and perform the copyrighted work. 17 U.S.C. § 106. One is liable for copyright infringement occurs when he violates one or more of the copyright owner's exclusive rights as enumerated in Section 106 of the Copyright Act of 1976, such as the right to reproduce the work, publish the work, and prepare derivative works. 17 U.S.C. § 106 (1990). The test for copyright infringement in the Ninth Circuit is the "substantial-similarity" test, which has within with extrinsic and intrinsic tests. *Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). Substantial-similarity requires an *extrinsic* examination of the similarities between only the protectable elements of an original work and an accused work, followed by a jury's *intrinsic* consideration of an ordinary person's impressions of the similarities between the two works. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994). The "extrinsic" test, "focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Funky Films v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).  The extrinsic analysis examines protectable expression in each work excluding ideas, historical facts, common phrases, scenes-a-faire. *Corbello v. Valli*, 974 F.3d 965 (9th Cir. 2020). "Protectable expression includes the specific details of an author's rendering of ideas..." *Funky Films*, 462 F.3d at 1077 (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002)).  "The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" Id. (quoting *Kouf*, 16 F.3d at 1045). *Benay v. Warner*

1   *Bros. Entm't Inc.*, 607 F.3d 620 (9th Cir. 2010).  Ninth Circuit law also protects an

2   author's selection and arrangement of unprotectable elements if the elements are

3   numerous enough, and their selection and arrangement original enough, that their

4   combination constitutes an original work. *Corbello v. Valli*, 974 F.3d 965 (9th Cir.

5   2020). "[W]hat a selection and arrangement copyright protects is the particular way in

6   which the artistic elements form a coherent pattern, synthesis, or design." *Id.,* (quoting

7   *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003)).

8          Defendants assert that the extent of which Defendant Caputo copied from *Don*

9   *Jimito* manuscript comprises mere historical facts and *scenes-a-faire* that are not

10  protectable copyright protection.  Plaintiff disagrees and alleges instead that the value

11  that Defendants obtain from *Don Jimito* is not from the facts or the any alleged

12  *scenes-a-faire* that were copied, but from the author James Hathaway's original

13  selection of stories about his father and his unique and protectable expression in those

14  stories that Defendants paraphrased.

15

16      **A.**    **DEFENDANT CAPUTO OBTAINED AND PARAPHRASED**

               **STORIES IN DON JIMITO WITHOUT LICENSE FROM**

17                 **PLAINTIFF**

18         On information and belief, Defendant Caputo only once acknowledged the

19  extent of his reliance on the *Don Jimito* manuscript during a speech for what appears

20  to be a book-tour for *Crossers*. (Bergeron Decl. ¶¶ 1-6.) Yet, the Acknowledgements

21  in *Crossers* fails to credit Hathaway with authorship or reveal *Don Jimito* as a

22  resource, which is an implicit assertion by Defendant Caputo that he created the

23  stories. During his speech, Caputo confessed:

24      "*I had nothing in the way of plot or characters until, through a ranching*

*couple we know, I came into possession of a yellowed, typewritten manuscript about a*

25  *man named Jim Hathaway. It wasn't signed, but the author evidently was Hathaway's*

*son, now deceased*."

26

27

28

-6-

1    Defendant Caputo's book-tour confession rings true. The extent of

2  paraphrasing by Defendant Caputo is remarkable. True and correct copies of the text

3  from the associated passages from *Don Jimito* and *Crossers* are copied into a table in

4  side-by-side columns and attached as Exhibit B to the Declaration of Jason Bergeron.

5  The discussion of those passages below leaves little doubt that the stories selected and

6  paraphrased by Defendant Caputo in *Crossers* were <u>originally</u> selected and written by

7  James Hathaway in *Don Jimito*, but without credit to or license from Plaintiff.

8                   1.        THE LADY IN THE KNIFE

9    In the passages from *Don Jimito* and *Crossers*, young, school age, Jim and

10  Ben, each possess a knife with an alluring depiction of a woman that could only be

11  seen if held up to the light in a certain way. (Id., Exhibit B, pg. B2.)  Extrinsic

12  analysis of copyright infringement includes a comparison of themes, style, mood, and

13  an original presentation of facts. *Corbello*, 974 F.3d at 975. The alleged facts in this

14  story (i.e., Jim's possession of a knife with secret, risqué feature), are historically

15  insignificant, but Hathaway's passage conveys more than rote facts. Hathaway's use

16  of the word "one" rather than referring to young Jim Hathaway (i.e., "If *one* held the

17  handle up to the light …" (italics here)) causes or allows the reader to visualize him or

18  herself holding the knife to the light to see the lady in the knife. The passage also

19  conveys Hathaway's expression of a theme that young boys of the region and era,

20  who likely had little in the way of personal possessions, would cherish a knife with a

21  secret risqué feature. Hathaway expresses this theme by informing that the knife was

22  envied by other boys and that young Jim Hathaway took good care of the knife as he

23  kept it "plenty" sharp. Defendant Caputo copied the same basic elements from

24  Hathaway's passage about Ben Erskine's special knife. Defendant's passage uses

25  "Holding…" rather than refer to young Ben (i.e., "*Holding* the knife up to the light

26  …" (italics here)), which copies Howard Hathaway's expression of this visual.

27  Moreover, Defendants also emphasize that Ben's knife was the "envy of the other

28

boys", which copies Howard Hathaway's expression of the same theme of the importance of such a knife to young Jim or Ben.

### 2.     GANG FIGHT

School age Jim/Ben each get into a gang fight and knock a Mexican kid out with slingshot projectile. (Id.) Jim/Ben then flees to hide fearing he had killed the kid. Ultimately, this passage is not about the alleged Gang Fight.  Howard Hathaway's protection expression comprises selecting and including this random Gang Fight story from numerous possible stories about Jim Hathaway (or any other real or fictitious person) to convey to the reader that the relationship between Jim Hathaway and his mother was challenging due to young Jim's wild streak. Defendants' effort to convey the same theme, that Ben Erskine and his mother had a challenging relationship, is unremarkably also expressed by selecting and paraphrasing the very same Gang Fight story.

### 3.     RIDING A HORSE INTO A SALOON TO FIGHT

In this story, Jim/Ben rides a horse into a saloon and jumps from the saddle onto a man and beats the man with his fists. (Id.) Hathaway's use of the phrases, "rode his horse through the door of a saloon and leapt onto a man" and "Jim flattened him" evoke the visual image of a crazy start to a barroom brawl that ends with a vicious beating by Jim Hathaway. Defendant Caputo copied the imagery with use of words and phrases like "jumped from saddle" and "commenced to whale on him" to evoke the same imagery used by James Hathaway for Ben Erskine in *Crossers*.

### 4.     HORSE CHASE AND KILLING

In this passage, preadolescents Jim/Ben each visit a saloon in Mexico to fetch a jug of tequila for their grandfather. (Id. pgs. B2-B4.) In the story, a large Mexican bar patron intimidates Jim/Ben, so the bartender helps the Jim/Ben evade the bar patron through a backdoor of the bar, which ends in a horse chase and the death of the pursuer and hiding of the body. (Id.) James Hathaway's storytelling conjures a mental image of the fear and intimidation young Jim feels in the bar, then a 10–11-year-old

boy being "eyed" and then "cursed at" by a "big, mean looking, half-drunk Mexican", being "eased out the back [of the saloon]" by the bartender before he "heard a horse coming up fast behind him", the panic or anger as the Mexican "lashed Jim's little horse across the rump", Jim's fear of not knowing if the thrown Mexican was dead from the fall, and Jim's panic in cutting of the Mexican's throat and hiding of the body in a well.  Hathaway's choice of words and pacing of the story causes the reader to feel young Jim's intimidation from the Mexican bar patron's torments, feel his panic from hearing the Mexican's horse coming up fast, the anger and violation Jim felt from his horse being lashed by the Mexican, and finally, the  desperation and fear as with "urgent concern", Jim "hurriedly dismounts and runs" to the thrown Mexican, and "took out the knife and without delay cut his late pursuers throat" and subsequently hid the Mexican's body in a well.

The Defendants' story copies Hathaway's pacing and choice of emphasis of events.  Ben likewise is intimidated and verbally tormented by the Mexican in the bar, slips out the back, and then fear and panic ensues when Ben "…hears rapid hoofbeats behind him" and when "[the Mexican] cracks Maggie's haunch with the ramal." Defendants also emphasize  the feeling of desperation by young Ben who "…hates this drunken vaquero for making him afraid. …, draws his knife, and with one swift stroke he opens in the Mexican's throat" and subsequently, with some "tugging and shoving that soaks him in sweat, rolls the body into a mine shaft" to hide the body.

5.     VIGILANTE JUSTICE

Jim/Ben each conspire with a Border Patrol Agent, Lon/Lee, respectively, in *Don Jimito*/ *Crossers* to catch and kill a Mexican smuggler in the mountains that they are tired of arresting. (Id. pg. B4.) Lon/Lee is shot by the smuggler but does not die immediately, and rides/crawls to a nearby ranch and later dies.  In this passage, James Hathaway evokes the impression that Jim Hathaway was not above vigilante justice, if he felt it was justified. Defendants copied this same story to convey the same trait in

1  Ben Erskine, a man willing to eschew legal formalities that impede what he

2  considered to be deserved justice.

3  6.     NIGHTTIME AMBUSH

4  Jim/Ben are at a friend's house and go outside at nighttime for water and is

5  ambushed and shot at by hired outlaws/gunmen. (Id. pg. B5.) Jim's/Ben's friend

6  shoots back and thinks he has hit one of the gunmen and goes to investigate. Id. Turns

7  out the hired outlaw/gunman was faking injury and jumps up and wrestles with

8  Jim's/Ben's friend and then breaks away and tries to get into Jim's/Ben's friend's

9  locked house. Id. Jim/Ben then shoots the man in the face/head at close range. Id.

10  James Hathaway's words illustrate an attempt on Jim Hathaway's life by hired

11  outlaws. Jim is ambushed at home at night with his friend. Together they are helping

12  Jim's wife, Virge, can chilis. James Hathaway's words and style illustrate how a quiet

13  evening at the Hathaway home could switch immediately to a harrowing gunfight and

14  life-threating ordeal. The reader can visualize the calm imagery of a border region

15  home, roasting chilis, which immediately switches to the nighttime gunfight, the

16  surprise of Jim's friend Valentino, who at first thinks he has stopped the outlaw but

17  then ends up in a physical struggle with the outlaw for his life. The story then turns to

18  a threat to Virge when the gunman "broke loose and made for the screen door" where

19  Virge is canning chilis. Finally, James Hathaway conveys amazement that Jim

20  remained calm and collected as he, "knelt down, held his pistol with both hands, took

21  careful aim and shot."  Aside from several, alleged facts, Defendants copied the same

22  style and pacing of James Hathaway's story. Defendants modified the story to some

23  extent, but the kernel of James Hathaway's protected expression remains. Defendants

24  emphasized the roasting and canning of peppers to emphasize the ordinariness of the

25  evening, the harrowing switch to a gunfight, the physical grappling between Mendoza

26  and the gunman, the panic when the gunman "broke free and sprinted for the house",

27  and the feeling of awe or respect when Ben "calmly" shoots the gunman in the head.

28

-10-

### 7.   JIM'S/BEN'S DEATH

Jim/Ben as older men each have their heads crushed and are killed in a corral while taming a wild cow/horse. (Id. pg. B5-B6.) James Hathaway's style and imagery describes the brutality of father's death by a "mad cow" and counterbalances that brutality by noting the tragic but unremarkably accidental cause of his father's death. Howard Hathaway wrote: "So the man who in turn had pursued and evaded enemies seeking his demise most of his life and met his end because of the swift charge of a mad cow." Defendants paraphrased this story of Ben Erskine's death by a "rank horse" in a corral and similarly note Ben Erskine's tragic accidental death with a sentence of the same structure, style, and imagery: "And so the man who had survived so many perils, who had evaded death at the hands of so many enemies, was killed as father had been, by a rank horse."

### 8.   HARSH DISCIPLINE

In a first story, young Jim/Ben are each forced by their mother to walk barefoot over sharp objects as punishment, and she refuses to pick them up when they cry. (Id. pg. B6.) In a second story, Jim's/ Ben's mothers strap them and/or their siblings into highchairs while she leaves to visit with friends or shop. (Id.) There is no historical significance to the alleged fact that young Jim was forced to walk "barefoot over sharp objects" or restrained to a "highchair" while his mom shopped or visited friends. Howard Hathaway's original selection however, and coupling of two unrelated and distinct stories, impresses upon the reader Jim Hathaway's exposure at a young age to harsh discipline and detached parenting, and in turn explains his father's resilience, toughness, and belief in harsh discipline. Howard Hathaway's original selection of two unrelated stories comprises his original expression and is protectable by copyright.  Defendants also copied or paraphrased Hathaway's selection of these same two unrelated stories to described Ben Erskine's mother's concept of discipline and parenting, and thereby copied Howard Hathaway's protected expression.

9.     COWBOY CHOW

In this story, Cowboys Jim/Ben were riding horses working a herd all day and come back to camp tired and hungry and commence eating from a pot of beans that had been cooking all day at camp without the lid on the pot, and into which grasshoppers had jumped. (Id.) Howard Hathaway's selection of this story provides entertainment but also conveys his expression of a theme that Jim Hathaway was not a fussy individual and rather capable of physically demanding cowboying work. The story also includes Howard Hathaway's protected expression in his style of writing, sequence of events, and word choice. James Hathaway provides the explanation for "crunchy" beans only after providing a mental picture of cowboys, famished and exhausted after a long day's work, devouring their supper that does not seem quite right, but continue to eat anyway because they are just too tired and hungry to investigate their oddly textured meal of beans - which readers recognize should not, "crunch." Hathaway saves the explanation for the odd textured meal to build suspense and give the reader the same unwelcome revelation that Jim Hathaway and his friends experience. Further, Hathaway's use of the word "crunchy" evokes a mental image and sound in the reader's mind because the reader knows that beans cooked on a pot all day should be soft and not "crunchy." Defendants copied Hathaway's same sequence of storytelling events to provide the same unwelcome revelation to the reader to explain the "crunchiest" beans, and only after providing a mental picture of cowboys, exhausted and famished after a long day's cowboying work.

10.     MAILMAN AS MATCHMAKER

In this introduction and courtship story, Virgie (Jim's wife) / Ida (Ben's wife) each ask the mailman for mail/a letter from no one in particular. (Id. pg. B6-B7.) The mailman hints to Jim/Ben that Virgie/Ida wants a letter. (Id.) Jim/Ben get the hint and writes Virge/Ida, which leads to Jim and Virgie's/Ben and Ida's relationships and later, marriages. (Id.)

1   James Hathaway uses writing style to convey that Virge Parker cleverly

2   initiated her relationship with Jim Hathaway via a hint to the mailman by "jokingly

3   told the mailman to bring her a letter" thereby hinting that the mail carrier should

4   relay her wish that Jim Hathaway should write her a letter, which the mailman

5   successfully relayed to Jim. Defendants copied James Hathaway's original style and

6   expression in the story of Ida and Ben: "You never bring any mail for me" is a

7   "joking" way of hinting that Ida wants the mailman to bring her mail.

8           11.     ASKING FATHER-IN-LAW FOR PERMISSION TO MARRY

9           In this engagement story, Jim/Ben each ask their future fathers-in-law, Jim

10  Parker/Merle Barnes, for permission to marry Virgie/Ida on the front porch, during a

11  discussion about livestock prices, and with Virgie/Ida hiding and listening in on their

12  conversation. (Id. pg. B7.) Jim Parker/Merle Barnes gives his consent. (Id.)

13          Howard Hathaway selected the two previous "Matchmaker" and "Asking"

14  stories to describe the courtship and engagement of Jim Hathaway and Virgie Parker.

15  James Hathaway's selection of these stories includes his expression of the theme or

16  concept introductions, courtship, and engagement between couples of the era and

17  region, such as Jim and Virgie, or Ben and Ida, were not steamy romances but instead

18  innocent and practical. Howard Hathaway's writing style and imagery here indicates

19  the conversation and tone is casual (i.e., "on the front porch talking about the current

20  cattle prices") and Jim Hathaway's interjection of a question of significant magnitude.

21  Hathaway further emphasizes the casual nature of the conversation by addition of a

22  quoted response, "I guess so" by Jim Parker and the resumption of the livestock price

23  discussion. Defendants copied the style and imagery of Hathaway's expression of

24  these personal family stories. Defendants portray same the casual tone (i.e., "on the

25  front porch jawing about horses and cattle prices") and copied Hathaway's use of a

26  quoted response by Merle Barnes, "Reckon that would be all right," and the

27  resumption of discussion about livestock to emphasize the informality of an otherwise

28  important conversation in the same way that Howard Hathaway did.

1        12.    <u>PRISON DESCRIPTION</u>

2        A Mexican prison in each passage is described with two ways of execution: by

3    firing squad and by forced water-and-food fast, followed by unlimited food and water,

4    which caused death by intestinal stoppage.  (Id. pg. B7.) Howard Hathaway's writing

5    provides the reader an ugly visual: a cliff base "…with bullet dents and blood

6    stains…"; and death by "…with-hold eats and drink for 3 or 4 days…", after which

7    "…they were allowed all the tortillas and water they wanted…" "…resulted in a

8    doughy mess …which caused death by intestinal stoppage and bloat."  Defendants

9    changed a few details but paraphrased James Hathaway's imagery, style, and

10   grammar, to convey a realistic, horrific description of the prison to the reader.

11   Defendants' passage describes a firing squad wall with "… a lot of blood stains and

12   bullet holes for when they wasn't practicing…" and "they would starve them for days

13   and not give them nothing to drink. Then when they were hungry enough to eat their

14   shoes and thirsty enough to eat their shoes and thirsty enough to drink their own pee,

15   they'd be fed all the tortillas and beans and water they could hold. The food would

16   form a big glob in their bellies and bung them up, and they would die of a busted gut."

17   Just as in Plaintiff's passage, the Defendants' passage copies the grammar and

18   narrative style to convey the horrors of the Mexican prison.

19

20        **B.    DEFENDANTS COPIED JAMES HATHAWAY'S ORIGINAL
              SELECTION OF STORIES AND VIOLATED PLAINTIFF'S
21            COPYRIGHT.**

22        The stories in *Don Jimito* likely comprise a significant quantity of factual

23   content about Jim Hathaway's life and adventures, which Defendants allege may be

24   freely copied. Howard Hathaway's original expression in each story, however, and his

25   selection of stories to form a cohesive expressive work, is not for free for unlicensed

26   appropriation. *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) ("Historical facts

27   and theories may be copied, as long as the defendant does not "bodily appropriate" the

28   expression of the plaintiff.") citing *Landsberg v. Scrabble Crossword Game Players,*

-14-

1     *Inc*., 736 F.2d 485, 489 (9th Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83

2     L.Ed.2d 403 (1984).

3         Howard Hathaway's original <u>selection</u> of stories for *Don Jimito* also comprises

4     his original expression. Hathaway's selection of stories conveys his original

5     expression of themes that reoccurred throughout the life of his father. These themes

6     were themes such as: turn of the 20th century at the Arizona-Mexico border region

7     was informal, and sometimes lawless and dangerous; that early 20th century border

8     region youth were the product of harsh discipline, a rough, sometimes violent, often

9     unsupervised, childhood; and that young men of the region and era were sometimes

10    forced to rely on various skills such as riding, shooting, and fighting, and traits such

11    as bravery, grit, and violence, to survive.  While the ideas and themes of these stories

12    may not be protected by copyright law, James Hathaway's original *selection* of stories

13    to convey or describe a coherent, synthesized collection of stories including these

14    themes and describing Jim Hathaway's life, is protectable expression.  *Corbello v.*

15    *Valli*, 974 F.3d 965 (9th Cir. 2020). Moreover, even assuming the events in these

16    stories are 100% true, the "facts" in these stories <u>are</u> facts about Jim Hathaway – these

17    "facts" are <u>not</u> facts about Ben Erskine, who is a *fictional* character. In other words,

18    the selection of stories and facts therein may be necessary to accurately describe the

19    life of Jim Hathaway, but Defendants' use of facts and selection of the same stories

20    Hatchway uses and selected is wholly unnecessary to describe the life of a fictional

21    character. Defendants could have created wholly original stories with the same themes

22    without any need to paraphrase Hathaway's original works. *Id*. at 971. (the Court

23    reasoning there: "Neither Valli nor the other defendants violated Corbello's copyright

24    by depicting in the Play events *in their own lives* that are also documented in the

25    Work.") (Emphasis here.) Defendants selection of the stories from *Don Jimito* copies

26    Hathaway's original selection and expression of themes in *Don Jimito*, which totals

27    too much copying. "Even a small taking may sometimes be actionable." *Norse v.*

28    *Henry Holt and Co*., 991 F.2d 563 (9th Cir. 1993), *citing e.g.*, *Harper & Row*

*Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565, 105 S.Ct. 2218 2233, 85 L.Ed.2d 588 (1985) (ruling that taking 300 words from presidential memoirs not fair use when copied words were "the heart of the book").  Defendants selection and use of Howard Hathaway's stories paraphrase events from Jim Hathaway's childhood, adolescence, courtship and engagement, adult life, and even his death. Defendants' selection of stories has taken more than the "heart" of *Don Jimito*, Defendants have taken the description of Jim Hathaway's entire life.

**V.      COPYRIGHT AND NINTH CIRCUIT LAW PROTECTS A COPYRIGHT OWNER'S RIGHT TO FIRST PUBLICATION**

The Copyright Act's protection of the right of *first publication* is expressed by the copyright holder's right to "print" and expressly made subject to the fair use provisions of § 107 of the Copyright Act. *See Harper Row, Publishers Inc v. Nation Enterprises*, 471 U.S. 539, 549-555, 105 S.Ct. 2218, 85 L.Ed.2d (1985).  The Supreme Court's precedent recognizes a difference between published and unpublished works. This precedent recognizes that a copyright owner's right to decide if, when, where and how, his or her work is published. *Id*.  In *Harper & Row v. Nation Enterprises*, 471 U.S. 539 (1985), former U.S. president Gerald Ford's memoir was unpublished, and he had an agreement with Harper & Row giving the publisher the right to publish his work first. *The Nation* newspaper, however, published an excerpt from the memoir without Harper & Row's permission, who sued the newspaper. The Supreme Court found for Harper & Row despite the newspaper's defense that the publication was fair use. The Supreme Court rejected the newspaper's argument and reasoned that it had infringed President Ford's exclusive right to first publication since it published the excerpt without permission and before President Ford or Harper & Row had a chance.

1

2

### A.   DEFENDANTS PUBLISHED SEVERAL OF PLAINTIFF'S UNPUBLISHED STORIES WITHOUT PERMISSION AND INFRINGED PLAINTIFF'S RIGHT OF FIRST PUBLICATION.

3

Defendants' book *Crossers* was published in 2010 and includes paraphrased

4  versions of at least twelve (12) stories from Plaintiff's manuscript. Defendants also

5  copied numerous other details and facts from the manuscript not mentioned in this

6  Response, but when considered together with the stories discussed herein, contribute

7  Defendants' violation of Plaintiff's right of first publication under the Copyright Act.

8  As the Ninth Circuit Court wrote in *Monge v. Maya Magazines, Inc.*[2], "[t]he right of

9  first publication implicates a threshold decision by the author *whether and in what*

10  *form* to release his work." quoting *Harper & Row* 471 U.S. at 553, 105 S.Ct. 2218

11  (emphasis by Ninth Circuit Court)). Publication of a work without the copyright

12  owner's permission and before he has authorized dissemination "seriously infringes"

13  the right to decide when and whether the work will be made public. *Id.* at 1182.

### a)   Betty Barr's Publication of Stories was Unauthorized.

14

15

16  As a defense, Defendants' Motion to Dismiss suggests that the stories they

paraphrased were first published by others, including Ms. Betty Bar. Defendants'

17  mistaken belief however is not a defense to their subsequent violation of Plaintiff's

18  right. In a civil suit, liability for copyright infringement is strict. *United States v. Liu*

19  731 F.3d 982 (9th Cir. 2013) citing *Monge*. 688 F.3d at 1182 ("[T]he innocent intent

20  of the defendant constitutes no defense to liability.'...").

21  As background, Barr alleges in a July 2005 column that she collaborated with

22  Howard Hathaway in 2000 to publish stories from *Don Jimito*. On information and

23  belief, and because of the alleged collaboration, certain first stories from the

24  manuscript were published in *The Bulletin* newspaper. (Bergeron Decl. ¶ 19). Plaintiff

25  does <u>not</u> allege however that those certain first stories were copied or paraphrased into

26  *Crossers.* (Bergeron Decl. ¶ 20). Plaintiff complains in this action of <u>other</u> stories

27

28

---

[2] 688 F.3d 1164, 1182 (9th Cir. 2012)

1   from the manuscript that were subsequently published long after Howard Hathaway's

2   death and without his heir's required authorization.

3        The alleged collaboration between Barr and Howard Hathaway ended when

4   Hathaway died in November of 2000. (Hathaway Decl. ¶ 6). Any alleged license held

5   by Barr also ended at that time: either by operation of law when Howard Hathaway

6   died, whereupon all rights to the manuscript transferred to his wife, Alberta

7   Hathaway; or when Barr read a letter from Plaintiff sent January 2, 2001 ("Plaintiff's

8   2001 letter"), informing Barr of his father's death, and conveying Alberta's express

9   rescission of permission to publish stories from the manuscript. (Hathaway Decl. ¶s

10  13, 14). Barr's July 2005 column confirms her receipt of Plaintiff's 2001 letter. Barr's

11  four-year compliance with the Plaintiff's demand to cease continued until 2005,

12  when, and without Alberta's or Plaintiff's consent, Barr resumed publication of

13  stories from the manuscript.  (Hathaway Decl. ¶ 18). Barr resumed publication of

14  stories from the manuscript after alleging in her column that she received a letter from

15  the sister of Howard Hathaway, Marion Hathaway Bittinger, wherein Barr alleges that

16  Marion wrote her: "I am sorry [I asked Plaintiff to write the letter asking you to stop].

17  (Bergeron Decl. ¶ 28).

18       Whether Barr misinterpreted Marion's letter as permission to resume

19  publication of tales from the manuscript, or she simply did not care that she violated

20  Alberta's copyrights, is immaterial - Marion's alleged letter does not, *alas because*

21  *she cannot*, grant Barr permission to use a manuscript in which she has <u>no</u> rights.

22  Howard Hathaway resided in and died in Idaho. (Hathaway Decl. ¶ 6). Howard

23  Hathaway's surviving spouse, Alberta Hathaway was the sole intestate heir to the

24  marital community property, which included the *Don Jimito* manuscript. *Nebeker v.*

25  *Piper Aircraft Corp.*, 747 P.2d 18, 19 (Idaho 1987). Moreover, Barr's conduct is

26  irrelevant to Defendants' liability. Liability for copyright infringement is strict and

27  Barr's prior violation of Plaintiff's right of first publication has no bearing on

28  Defendant's liability for the same violation.  *Monge*, 688 F.3d at 1170 (9th Cir.2012)

(citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.08[B][1] (Matthew Bender rev. ed. 2011)).

Defendants have the burden of proving that their infringement was innocent. See 17 U.S.C. § 504(c)(2); *Los Angeles News Service v. Reuters Television Intern.*, Ltd., 149 F.3d 987, 996 (9th Cir. 1998).  Defendants cannot prove they were entitled to select, paraphrase, and publish stories from the manuscript without Plaintiff's permission. Defendants conduct violates of Plaintiff's right of first publication and Plaintiff's First Amended Complaint includes ample notice of Plaintiff's claim against Defendants' violation.

## VI.    Conclusion

A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *In re Zimmer*, 313 F.3d 1220, 1222 (9th Cir. 2002). This Court should accept as true the well-pleaded factual allegations in the complaint. *Skilstaf, Inc. v. CVS Caremark Corp*., 669 F.3d 1005, 1014 (9th Cir.2012). Plaintiff's First Amended Complaint pleads (i) Defendant Caputo's admission that he had "nothing in the way of plot or characters" without Plaintiff's manuscript, (ii) Plaintiff's allegation that Defendants' character Ben Erskine was based on the protectable expression in the manuscript's stories and selection of stories about Plaintiff's grandfather, and (iii) that Defendants published Plaintiff's previously unpublished stories without permission. The allegations of Plaintiff's First Amended Complaint, taken as true establish that Defendants' work, *Crossers* paraphrased original expression in stories from Plaintiff's manuscript *Don Jimito*, copied Plaintiff's original selection of stories from the manuscript, and published those paraphrased stories first and without permission from Plaintiff. Based on the above, Plaintiff requests that this Court deny the Defendants' Motion to Dismiss, or if

1  necessary, grant Plaintiff leave to amend the First Amended Complaint to cure any

2  deficiency this Court finds.

3

4                                                    Dated this 5th day of February 2021

5                                                    **Venjuris, P.C.**

6

7

8                                 By   /s/ Michael F. Campillo
                                        Michael Campillo (AZ Bar 019014)
9                                       1938 East Osborn Road
                                        Phoenix, Arizona 85016
10                                      Tel: 602-631-9100
                                        Fax: 602-631-4529
11                                      E-Mail: mcampillo@venjuris.com
                                        Attorneys for Plaintiff
12

13                          **CERTIFICATE OF SERVICE**

14
    ⊠       I hereby certify that on 2021-02-05, I electronically transmitted the attached
15          document and attached Declarations of Jason Bergeron and James Richard
            Hathaway to the Clerk's Office using the CM/ECF System for filing and
16          transmittal of a Notice of Electronic Filing to the following CM/ECF
            registrants:
17

18                              David Jeremy Bodney
19                          bodneyd@ballardspahr.com,
                            kinseyc@ballardspahr.com,
20                       litdocket_west@ballardspahr.com

21
                                Robert S Gutierrez
22                         GutierrezR@ballardspahr.com,
                         LitDocket_West@ballardspahr.com,
23                         ToyamaK@ballardspahr.com
24

25    s/ Michael F. Campillo

26

27

28