**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Richard Hathaway,<br><br>    Plaintiff,<br><br>v.<br><br>Philip Caputo, et al.,<br><br>    Defendants. | No. CV-20-00055-TUC-DTF<br><br>**ORDER** |

Before the Court are Defendants' Amended Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 33), Defendants' Request for Judicial Notice (Doc. 32), and Plaintiff's Motion for Leave to File Second Amended Complaint for Copyright Infringement (Doc. 40). These matters are fully briefed. (Docs. 39, 41, 42, 43.) The Court held oral arguments on April 22, 2021. (Doc. 45.) The parties have consented to a decision being rendered by the undersigned United States Magistrate Judge. (Doc. 8, 27, 38.) As more fully set forth below, based on the pleadings, the Court will **grant** the motion to dismiss and **deny** the motion for leave to amend.

## BACKGROUND

**First Amended Complaint**

In the First Amended Complaint (FAC), Plaintiff alleges that he is the sole owner and copyright claimant of "Don Jimito," an unpublished manuscript written by his father. (Doc. 13, ¶¶ 13-14.) "Don Jimito" "is an attempted biography of the life and times of [Plaintiff]'s grandfather." *Id.* ¶ 14. Plaintiff's father registered the copyright for "Don

Jimito" in May 2000. *Id.* ¶ 15. Following the death of his father in 2001, Plaintiff became the copyright claimant for "Don Jimito." *Id.* ¶ 17. Following the death of his mother and an assignment from his sister in 2006, Plaintiff became the sole owner of the manuscript. *Id.* ¶ 19.

In 2009, subsidiaries of Penguin Random House Publishing ("Defendant Random House") published *Crossers: A Novel* ("*Crossers*") written by Philip Caputo ("Defendant Caputo").[1] *Id.* ¶¶ 28, 35, 37. *Crossers* has been promoted in Arizona and is available for purchase in Arizona through Defendant Random House's website. *Id.* ¶¶ 41-42. Plaintiff alleges that Defendant Caputo had an interest in writing about "border lore," but until he obtained "Don Jimito," he was without a plot. *Id.* ¶¶ 26-27.

In 2019, Plaintiff learned of *Crossers*. *Id.* ¶ 31. He alleges that Defendant Caputo "copied or derived characters, elements, and stories from Don Jimito for the book, *Crossers* . . . without permission from the owner and copyright claimant, [Plaintiff]." *Id.* ¶ 28. Plaintiff asserts Ben Erskine from *Crossers* is based on his grandfather. *Id.* ¶ 29. Upon comparison, Plaintiff states that there are "no fewer than seventeen original stories from Don Jimito, each story being further comprised of original protectable elements." *Id.* ¶ 30. Plaintiff concludes that Defendant Caputo willfully copied from "Don Jimito" such that "the possibility of independent creation . . . is precluded." *Id.* ¶¶ 33-34. Plaintiff asserts he has never authorized Defendants to "copy, produce, reproduce, sublicense, or make derivative works of Don Jimito." *Id.* ¶ 48.

**Don Jimito**

"Don Jimito" is a typed, unpublished manuscript by Jim Hathaway's son (Plaintiff's father). (Doc. 13 at ¶ 14; Doc. 32-2.) The manuscript has a few handwritten edits sprinkled throughout. (Doc. 32-2 at 14, 44, 76, 97, 119.) It contains many short stories about Jim Hathaway and his life. While the manuscript is somewhat organized, it is not strictly chronological. There are no breaks for chapters or any outward organizational structure.

---

[1] "Defendants" refers to Defendant Caputo and Defendant Random House collectively. The FAC does list Amazon.com Inc. and Audible Inc. as defendants. (Doc. 13 at 1.) However, they have been dismissed from this matter. (Doc. 36.) Accordingly, the Court shall not refer to them any further.

1 Overall, it tells the life and times of Jim Hathaway and the mark he left on the surrounding
2 area and people.
3     In the forward, the author describes the manuscript as "an attempt to set forth, in
4 writing, a biography of a person so unusual that [he was] wondering how to begin." *Id.* at
5 2. He described collaborating with several people who knew his father "to produce a
6 well[-]rounded history of this enigmatic personage to each whose life touched his, for
7 however long or briefly, a different but lasting impression resulted." *Id.* The narrator admits
8 that many of these stories come to him from people who heard them from Jim. *Id.* at 12.

**Crossers**

    Defendants describe *Crossers* as follows:

> *Crossers* is a fictional, literary work of roughly 450 pages. *See* RJN Ex. B (hereinafter, "*Crossers*"). It is detailed and descriptive, painting vivid images of Arizona—mostly in modern times but also during the Depression—as well as New York City in the year after 9/11, and Mexico during the revolutions of the early Twentieth Century and along the U.S. border in present day. The novel utilizes several narrative structures, alternating between modern stories, told by an omniscient narrator, and tales of Ben Erskine and his compatriots, told through their first[-]person accounts given years later to a historical society.
>
> The central plot involves roughly two years in the life of Gil Castle. Reeling from the death of his wife during the September 11 attacks, Castle leaves Manhattan for the San Ignacio ranch, which has been in his family for generations and is currently owned by his cousin, Blaine Erskine. Castle begins a new life there, building relationships with Blaine and his wife, starting a new romantic relationship, and becoming progressively more involved in the ranch. He encounters Miguel Espinoza, a Oaxacan migrant on the brink of death, who has just witnessed and narrowly escaped the murder of two other border crossers by members of a drug cartel. Castle befriends Miguel and becomes embroiled first in the homicide investigation and then in a growing dispute with the leader of the cartel.
>
> Woven in with Castle's plot are stories of two other primary characters. Yvonne, newly in charge of her dead husband's drug cartel, has just purchased the ranch across the border from the San Ignacio, in a bid for revenge against Blaine relating to her father's murder. "The Professor," a former DEA agent turned assassin and lieutenant for the Carrasco drug cartel (Yvonne's rival), works to maintain relationships with federal agents on both the U.S. and Mexican side of the border, while also infiltrating Yvonne's operation.

> Interspersed in these plot lines are glimpses of the life of Castle's grandfather, Ben Erskine, told mostly through first-person accounts—his uncle's journal entry, letters from his daughter, and oral histories given by friends to a local historical society. Though far from a full history, these interludes tell stories of Ben's life: a fateful run-in with a vaquero (cowboy) at a bar as a teenager, months as a soldier of fortune (and then Captain) in the Mexican revolution, a brief period as a gun runner, attempted assassinations by those seeking vengeance for past run-ins with him, and a deadly shoot-out in 1951 provoked by an insult about Ben's wife for which he was tried for murder.
>
> In the central plot, as Castle settles into life in Arizona, Yvonne continues to run her cartel and begins an escalating series of attacks on the San Ignacio, in hopes of forcing Blaine out. She forces a local smuggler to move border crossers through the San Ignacio, rather than other property, causing damage and leading to gruesome discoveries by Castle and Blaine. She then runs drugs through the property, leading to shoot-outs and Blaine's recruitment of local minutemen. Finally, she orders the murder of Miguel and kidnaps Blaine, his wife, and Castle, holding the three hostage to force them to sell the San Ignacio.
>
> As action in the present day escalates, the book reveals that the man Ben killed in 1951 was Yvonne's father and that his death prompted her vindictive assault. The story culminates in a dramatic rescue mission, with the Professor guiding members of the Carrasco cartel, Mexican federal officers, and FBI agents in a helicopter raid of Yvonne's ranch, leading to the rescue of Castle and his cousin's wife but the death of Blaine and Yvonne.

(Doc. 33 at 5-7.) At oral argument, Plaintiff agreed with Defendants' description but did contend that they attempted to downplay Ben's importance. (Doc. 47 at 27.) The Court again notes that Ben is an essential character in *Crosser* and adopts Defendants' description. *Id.* at 13.

**Amended Motion to Dismiss**

Defendants move for dismissal on the ground that Plaintiff failed to state a claim. (Doc. 33.) Defendants argue that the FAC is conclusory and insufficient to state a claim. *Id.* at 2-3. They assert that Plaintiff failed to allege any similarities between the works in his FAC or why factual recitations from a non-fiction work would be protectable. *Id.* at 8.

Further, Defendants claim that Plaintiff would be unable to state a copyright infringement. *Id.* According to Defendants, the historical facts and characters would not be

protected under copyright law. *Id.* at 8-9. They thus contend that any amendment would be fatal as "any purported similarities are either historical facts or *scenes a faire* (or both), and therefore not protected by copyright law." *Id.* at 3. Defendants also argue that the difference in expression of any similar events precludes copyright protections. *Id.* at 10-11.

**Motion for Leave to Amend**

Plaintiff filed a separate motion for leave to amend. (Doc. 40.) He attached an exhibit demonstrating the differences from the previous complaint. (Doc. 40-1.) The proposed Second Amended Complaint (SAC) included twelve excerpted and compiled passages from the two works for side-by-side comparison. (Doc. 40-1 at 12-17.) Further, Plaintiff alleges that "Defendants copied (i) original protected expression in each story, (ii) the original protected selection of stories in Don Jimito, and (iii) first published the unpublished original expression and selection without the consent of Plaintiff." *Id.* ¶ 31.

Defendants oppose leave to amend. (Doc. 42.) First, Defendants characterize this as "a belated attempt to comply with the Local Rules." *Id.* at 2. Second, Defendants argue that the amendment would be futile based on their previous arguments. *Id.*

## DISCUSSION

**Legal Standard to State a Claim**

A motion brought under Rule 12(b)(6), Fed. R. Civ. P., tests the legal sufficiency of a claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint should be dismissed where insufficient facts are pleaded to support a claim against the defendant under a cognizable legal theory. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). "On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party," *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998) (citing *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)), and all reasonable inferences are drawn in favor of the nonmoving party, *see Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). Under Rule 12(b)(6), a complaint "should not be dismissed unless it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Wyler Summit P'ship*, 135 F.3d at 661 (alteration in *Wyler Summit P'ship*) (quoting *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 535-36 (9th Cir. 1995)).

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice. . . . [A] court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Brown v. Life Ins. Co. of N. Am.*, No. CV-19-00025-TUC-JGZ, 2019 WL 3838983, at *1 (D. Ariz. Aug. 15, 2019) (alterations in *Brown*) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007)); *see also Biltmore Associates, LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 665 n.1 (9th Cir. 2009) ("A court may consider documents . . . that are incorporated by reference into the complaint."). Courts may take judicial notice of publications to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

Courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). And, they must consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 814-15 (9th Cir. 2020) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Id.* at 815 (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)).

**Judicial Notice**

Defendants request that the Court take judicial notice of the following: the unpublished manuscript of "Don Jimito," a copy of *Crossers*, copies of the *Legends of Jim Hathaway* articles, and a copy of *Gunfight Case Goes to Jury* article. (Doc. 32.) Plaintiff did not file or otherwise voice an objection to Defendants' request for judicial notice. (*See* Doc. 39.) The Court will consider the copies of *Crossers* and "Don Jimito" as they are incorporated by reference in the FAC and proposed SAC. (Doc. 13 ¶¶ 13-14, 28-33, Doc. 40-1 ¶¶ 13-14, 28-34.) Further, the Court shall consider the remaining requested items for what was in the public realm. See *Von Saher*, 592 F.3d at 960. Additionally, their authenticity has not been questioned.

Plaintiff attached the following exhibits to his opposition to Defendants' motion to dismiss: Partial transcript from a speech by Defendant Caputo, comparison of similarities of the works, articles describing Plaintiff's father's writing, *The Legends of Jim Hathaway-Part 1*, *Hathaway Legends Writer's view of the series*, a letter from Plaintiff to the author of the *Legends of Jim Hathaway* series, copies of certificates of registration for TXu954-793 and TXu1-020-064, and copyright transfer of Don Jimito Manuscript to Plaintiff. (Docs. 39-1, 39-2.) Plaintiff did not request that this Court take judicial notice of these documents. (*See* Doc. 39.) Defendants object to the documents but do not challenge their authenticity. (Doc. 41 at 2 n.1.) The Court will consider the partial transcript of Defendant Caputo's speech, the comparison of similarities, *The Legends of Jim Hathaway-Part 1*, *Hathaway Legends Writer's view of the series*, the copies of the certificates of registration, the copyright transfer of "Don Jimito" to Plaintiff.[2] These items have either been sufficiently incorporated by reference or will be used only to determine what was in the public realm. (Doc. 13 ¶¶ 16, 20, Doc. 40-1 ¶¶ 16, 20.) The Court will not consider the articles describing the writing of the author of "Don Jimito" or the letter from Plaintiff to the author of the *Legends of Jim Hathaway* series. Plaintiff is attempting to use

---

[2] The Court notes that as "all well-pleaded allegations of material fact are taken as true," *see Wyler Summit P'ship*, 135 F.3d at 661, most of these documents add little to nothing to the Court's analysis.

- 7 -

1  these articles for purposes outside the record and for the accuracy of the content—not what
2  was available within the public realm and they are not incorporated into the FAC or
3  proposed SAC.

4  Both parties agree that the attachments do not require the motion to dismiss be
5  converted into a motion for summary judgment. (Doc. 47 at 4, 37.) The Court agrees and
6  thus will not convert the motion into a motion for summary judgment.

**Copyright Infringement**

Copyright infringement requires plaintiffs to show (1) that they own the copyright and (2) that defendants copied protected aspects of the work. *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir.), *cert. denied*, 141 S. Ct. 453 (2020). The second prong has two components: "copying," which requires that defendant had access to the plaintiff's work and the two works "share similarities probative of copying"; and "unlawful appropriation," which requires the works share substantial similarities. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d at 1079. Courts have used "substantially similar" to describe the requirements of copying and unlawful appropriation. *Id.* However, the two terms offer different levels of protection.

> To prove copying, the similarities between the two works need not be extensive, and they need not involve protected elements of the plaintiff's work. They just need to be similarities one would not expect to arise if the two works had been created independently. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992); 4 Nimmer on Copyright § 13.01[B]. To prove unlawful appropriation, on the other hand, the similarities between the two works must be "substantial" and they must involve protected elements of the plaintiff's work. *Laureyssens*, 964 F.2d at 140.

*Id.*

District courts can consider substantial similarity for literary works in a motion to dismiss. *Masterson v. Walt Disney Co.*, 821 Fed. App'x 779, 781 (9th Cir. 2020); *see also Rentmeester*, 883 F.3d at 1118. Courts use a two-part test to examine if works are substantially similar. *Skidmore*, 952 F.3d at 1064. First, the extrinsic test requires that

- 8 -

courts "compare[] the objective similarities of specific expressive elements in the two works." *Id.* This inquiry is limited to protectable expressions. *Id.* For literary works, "[t]he extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006), *overruled on other grounds by Skidmore*, 952 F.3d at 1079 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).

Second, the intrinsic test requires courts to examine "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Skidmore*, 952 F.3d at 1064 (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008)). For works to be substantially similar both the extrinsic and the intrinsic tests must be satisfied. *Id.* At the motion to dismiss stage, only the extrinsic test is before courts. *Masterson*, 821 Fed. App'x at 782.

Copyright law protects expression of ideas and facts, not the underlying ideas or facts. 17 U.S.C. § 102(b); *see Rentmeester*, 883 F.3d at 1117. "[C]opyright is intended to increase and not to impede the harvest of knowledge." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985). To this end, it is designed to protect original authorship. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359 (1991). Copyright protects the original work of the author; accordingly, "writing style and presentation" are protected. *Corbello v. Valli*, 974 F.3d 965, 976 (9th Cir. 2020) (quoting *Feist Publ'ns*, 499 U.S. at 348). Material in the public domain, historical facts, common phrases, elements treated as fact in original, *scenes a faire* ("situations and incidents that flow necessarily or naturally from a basic plot premise"), and "stock scenes and themes that are staples of literature" are unprotected. *See id.* at 971, 975 (9th Cir. 2020) (quoting *Benay v. Warner Bros. Ent., Inc.*, 6507 F.3d 624-25 (9th Cir. 2010), *overruled on other grounds by Skidmore*, 952 F.3d at 1079); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) (definition of *scenes a faire*); *Rentmeester*, 883 F.3d at 1118. "A character based on a historical figure is not protected for copyright purposes." *Corbello*, 974 F.3d at 976.

Selections or arrangements of unprotected elements may be protected where "the works share, in substantial amounts, the 'particular,' *i.e.*, the 'same,' combination of unprotectable elements." *Skidmore*, 952 F.3d at 1075. Further, "combination" does not mean any arrangement but instead is only protected if it is a "*new* combination" or a "*novel* arrangement." *Id.* (quoting *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 363 (9th Cir. 1947)).

*FAC*

The FAC fails to sufficiently state a claim against Defendants. It makes conclusory allegations that "no fewer than seventeen original stories from Don Jimito" are copied in *Crossers*, which lacks detail and specificity. (Doc. 13 at ¶ 30.) This is the total of the copying and unlawful appropriation allegations. Accordingly, Plaintiff failed to state a claim. *See Iqbal*, 556 U.S. at 678.

However, the complaint shall not be dismissed unless Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Wyler Summit P'ship*, 135 F.3d at 661. For this determination, the Court shall consider the proposed SAC and determine if it plausibly states a claim or if it is futile or subject to dismissal. *See Kroessler*, 977 F.3d at 815.

*Proposed SAC*

The Proposed SAC provides twelve stories Plaintiff alleges were copied from and constituted unlawful appropriation of "Don Jimito." At oral argument, Plaintiff's counsel conceded that, "for the purposes of the substantial similarity analysis," the lawsuit was limited to only these twelve stories. (Doc. 47 at 39.) Thus, the Court shall consider these twelve in examining the substantial similarities between the two works.

As previously explained, historical elements are not protected. *See Corbello*, 974 F.3d at 976. "Don Jimito" is held out as a work of historical fact. The author did not create the characters, plot, settings, etc, and noted when a story could not be verified or was just rumor. The two stories where the author questioned the accuracy are not at issue in this action, but they do underscore the default representation that the stories are historical fact

unless otherwise noted. (Doc. 32-2 at 80, 84-85.) The Court is unswayed by Plaintiff's current attempts to characterize the work as "embellished for entertainment's value." (Doc. 39 at 4.) If an author holds out a work as truth and fact, they will be held to that assertion under the asserted-truths doctrine. *See Corbello*, 974 F.3d at 979. This does not rest on publication, but rather the representation of the work. *Id.* at 980. The Court does not find the distinction that *Crossers* is fictional to be of any significance. At oral argument, Plaintiff contended that because *Crossers* was fictional, it was not "necessary" or there was no "justification" to use the same or similar stories. (Doc. 47 at 32-33.) The Court disagrees and instead focuses on what the original work claimed to be or how it was held out.

Further, Plaintiff contends that some of the facts are not historically significant. (Doc. 39 at 7, 11.) At oral argument, Plaintiff did not present a case holding that the fact must be significant (Doc. 47 at 34), and the Court does not find such a distinction in the case law. Thus, the Court considers if a statement was held out as a historical fact, not whether it is historically significant.

The Court has examined each story and determines that they are all presented as historical fact and are mere *scene a faire*, both of which are unprotected. *See Corbello*, 974 F.3d at 979; *Cavalier*, 297 F.3d at 823. Plaintiff asserts that some of the stories copied narrative style, pacing, expression, or theme. (Doc. 39 at 7-14.) The Court is unconvinced by these arguments. The narrative style is similar in both works to the extent that most westerns share similar styles and many of the complaints about theme are unprotected because they are merely *scenes a faire*. *See Cavalier*, 297 F.3d at 823.

For example, Plaintiff claims that two stories share the same pacing, "Horse Chase and Killing" and "Nighttime Ambush." (Doc. 39 at 9-10.) However, both works employ different pacing for these stories. In "Horse Chase and Killing," the author of "Don Jimito" took an aside to tell the story of "The Lady in the Knife," which is not done in *Crossers*. Further, the quick, hurried pacing of a horse chase is a common staple of any western and not protectable here.

In "Nighttime Ambush," the pacing of the two works is again different. "Don

Jimito" employed a more sequential action method, whereas *Crossers* utilized simultaneous action. In "Don Jimito," Jim shot the first gunman "in one cheek and out the other without breaking a tooth," and then, a second gunman started to shoot, followed by a neighbor coming to help. (Doc. 32-2 at 51.) The second gunman disappeared, and the first gunman was later killed in a different gunfight. *Id.* at 52. In *Crossers*, as the worker was struggling with the first gunman, Ben shot and killed the second. (Doc. 32-3 at 382.) Further, in *Crossers*, both gunmen are shot and killed during the altercation; thereby finishing the story at Ben's home, instead of following one to his death at a different gunfight and never mentioning the second again, as was done in "Don Jimito." Simply put, the two works' protected elements are not substantially similar.

Plaintiff failed to state a claim for copyright infringement. Plaintiff cannot copyright Jim Hathaway's life and the historical facts surrounding it. *See Corbello*, 974 F.3d at 976. The similarities are either similarities in historical facts or in *scenes a faire*. The two works are thus not substantially similar. If "Don Jimito" had been a fictional story, the outcome may have been different, but it is a story portraying itself as historical fact. Once the unprotected elements are removed, it is only afforded thin protection, which was not violated here. *See Feist Publ'ns*, 499 U.S. at 349; *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1260 (9th Cir. 2021) (explaining if there is narrow range of expression, then copyright protection is thin).

To the extent that Plaintiff argues the selection and arrangement of the stories is sufficient, the Court disagrees. At oral argument, Plaintiff contended that "the defendants can't choose—well, can't write the stories, paraphrase the same stories, that James Howard Hathaway originally wrote and put into *Don Jimito*, the Manuscript, and, by doing so, doing it closely enough that they also copied expression." (Doc. 47 at 21-22.) *Crossers* does not copy a novel combination of unprotectable elements from "Don Jimito," which is what is required for a selection and arrangement claim. *See Skidmore*, 952 F.3d at 1075. First the stories are not in the same order and are woven in with a completely different story about Gil Castle. Second, there are stories left from and added into *Crossers* to

distinguish it from "Don Jimito." Counsel says this is because Defendants "pick[ed] the gems" from "Don Jimito." (Doc. 47 at 34.) This misses the point. A novel or new combination was not copied into *Crossers*.

*First Publication*

Plaintiff argues that Defendants violated his right of first publication. (Doc. 39 at 17-19.) For this proposition, he cites *Harper & Row*, 471 U.S. 539, and *Monge v. Maya Mags., Inc.*, 688 F.3d 1164 (9th Cir. 2012). (Doc. 39 at 17.) Both cases consider whether defendants' publication of copyrightable material was excused under the fair-use doctrine. *Harper & Row*, 471 U.S. at 549; *Monge*, 688 F.3d at 1170. Merely leaving material unpublished does not protect otherwise uncopyrightable portions of the material. *Cf. Harper & Row*, 471 U.S. at 556-57, 560 (explaining that expression/fact dichotomy balances copyright protection and First Amendment values). In *Monge*, the defendants published pictures of a famous couple's secret wedding and wedding night. 688 F.3d at 1169-70. The Ninth Circuit stated, "Under copyright law, Maya possesses 'an unfettered right to use any factual information revealed [through the photos] for the purpose of enlightening its audience, but it can claim no need to bodily appropriate [the couple's] expression of that information by utilizing portions of the actual [photos].'" *Id.* at 1175 (alterations in *Monge*) (quoting *Iowa State Univ. Rsch. Found. Inc. v. Am. Broad. Cos. Inc.*, 621 F.2d 57, 61 (2d Cir. 1980)). In *Harper & Row*, defendant published verbatim quotes from the then-unpublished autobiography of President Gerald Ford. 471 U.S. at 548-49. Thus, the Supreme Court did not need to reach the issue on whether defendant's "appropriation of unoriginal and uncopyrightable elements encroached on the originality embodied in the work as a whole." *Id.* Accordingly, as stated above these works are not substantially similar, copyright protections were not violated and therefore the right of first publication cannot transform facts into expression or unprotected material into protected material.

Because Plaintiff has failed to state a claim in both the FAC and the proposed SAC, and from the facts presented in his pleadings and at oral argument, he cannot state one, the

Court denies his request to file an amended complaint. *See Kroessler*, 977 F.3d at 815. Further, the Court will dismiss this action with prejudice. *See Wyler Summit P'ship*, 135 F.3d at 661; *Panton v. Strong*, No. 2:17-cv-00050-JFW(JEM), 2018 WL 5099666, at *6 (C.D. Cal. March 14, 2018).

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. 33) is granted and this matter shall be dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to amend (Doc. 40) is denied.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly and close this case.

Dated this 10th day of May, 2021.

Honorable D. Thomas Ferraro
United States Magistrate Judge